**INTER MARITIME FORWARDING CO., Inc.**

v.

**UNITED STATES.**

C.D. 2318; Protest No. 58/16546.

United States Customs Court,
First Division.

Feb. 26, 1962.

Mollison, J., dissented.

Bernard B. Smith, New York City (Tompkins & Tompkins by Allerton deC. Tompkins and Michael Alexander, New York City, of counsel), for plaintiff.

William H. Orrick, Jr., Asst. Atty. Gen. (Richard E. FitzGibbon, New York City, trial attorney), for defendant.

Before OLIVER, MOLLISON, and WILSON, Judges.

WILSON, Judge.

The merchandise in the case at bar consists of woven fabric of wool, weighing over 4 ounces per square yard, imported from England, and subject to classification under paragraph 1109(a) of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 1109(a). The cloth in question was entered for consumption at the port of New York after 3:07 p. m. eastern standard time, July 25, 1957, and before August 13, 1957. The merchandise was assessed with duty at a "nonquota" rate of 37½ cents per pound, plus 45 per centum ad valorem, under said paragraph 1109(a), supra. The importer claims that the merchandise is subject to duty under the involved paragraph, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at only 37½ cents per pound, plus 25 per centum ad valorem.

Under paragraph 1109(a) of the Tariff Act of 1930, as unmodified, woven fabrics, weighing more than 4 ounces

per square yard, wholly or in chief value of wool, were dutiable at 50 cents per pound, plus an ad valorem rate of duty, depending upon the value per pound of the fabric. The other paragraphs of the tariff act here involved are paragraphs 1108 and 1109(a), as modified by the General Agreement on Tariffs and Trade, T.D. 51802, part I, schedule XX, as made effective by Presidential Proclamation No. 2761A, dated December 16, 1947, 61 Stat. 1103, which read as follows:

| Tariff Act of 1930 Paragraph | Description of Products | Rate of Duty |
| --- | --- | --- |
| 1108 | Woven fabrics, weighing not more than four ounces per square yard, wholly or in chief value of wool, regardless of value:<br>    If the warp is wholly of cotton or other vegetable fiber .......... | 30¢ per lb. and 25% ad val. |
| |     Other ............... | 37½¢ per lb. and 25% ad val. |
| | NOTE: The United States reserves the right to increase the ad valorem part of the rate applicable to any of the fabrics provided for in item 1108 or 1109(a) of this Part to 45 per centum ad valorem on any of such fabrics which are entered in any calendar year in excess of an aggregate quantity by weight of 5 per centum of the average annual production of similar fabrics in the United States during the 3 immediately preceding calendar years. | |
| 1109(a) | Woven fabrics, weighing more than four ounces per square yard, wholly or in chief value of wool, regardless of value ................... | 37½¢ per lb. and 25% ad val. |

As indicated above, by virtue of said trade agreement and proclamation, a right was reserved to the United States to increase the ad valorem rate on such fabrics under a quota provision.

The facts in the case at bar which give rise to the present controversy are as follows:

On September 28, 1956, the President of the United States, by proclamation No. 3160 (T.D. 54212), 71 Stat. c 12, invoked the "reservation" contained in the "NOTE," supra, for the remaining 3 months of that year and also invoked it for each calendar year thereafter, until otherwise proclaimed. The provisions of said proclamation No. 3160, so far as pertinent, read as follows:

7. "WHEREAS I find that upon invocation of the said reservation set forth in the second recital of this proclamation, effective October 1, 1956, it will be appropriate to carry out the trade agreement specified in the first recital of this proclamation that the ad valorem part of the rate be 45 per centum ad valorem in the case of any of the fabrics described in the said item 1108 or 1109(a) in Part I of Schedule XX to the General Agreement on Tariffs and Trade set forth in the second recital of this proclamation, * * *:

"(a) during the period from October 1, 1956, to December 31, 1956, both inclusive, if such fabrics are entered, or withdrawn from warehouse, for consumption after the total aggregate quantity of 3,500,-000 pounds of such fabrics has been so entered or withdrawn; which quantity I find to be not less than 1¼ per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics; and

"(b) following December 31, 1956, until otherwise proclaimed by the President, if such fabrics are entered, or withdrawn from warehouse, for consumption in any calendar year after that total aggregate quantity by weight of such fabrics which shall have been notified by the President to the Secretary of the Treasury, and published in the Federal Register, has been so entered or withdrawn during such calendar year; which quantity the President shall have found to be not less than 5 per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics; * *

* * * * * *

"NOW, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under and by virtue of the authority vested in me by the Constitution and the Statutes, including the said section 350 of the Tariff Act of 1930, as amended, do proclaim as follows:

"1. In order to carry out the said trade agreements specified in the first and third recitals of this proclamation, until otherwise proclaimed by the President, the ad valorem part of the rate which shall be applied to the said fabrics described in the seventh recital of this proclamation, entered, or withdrawn from warehouse, for consumption in excess of the quantity specified in clause (a) of that recital, or in excess of a quantity notified to the Secretary of the Treasury pursuant to clause (b) of that recital, shall be 45 per centum ad valorem. * *"

On May 24, 1957, the President notified the Secretary of the Treasury that when the 1957 imports of the specified woven fabrics of wool reached 14,000,-000 pounds, the ad valorem rate under paragraph 1109(a) would be increased from 25 per centum to 45 per centum (T.D. 54370). This notice was published in the Federal Register under date of May 28, 1957 (vol. 22 F.R. page 3717). Thereafter, on December 3, 1957, the Commissioner of Customs notified the collector of customs at the port of New York (exhibit 4) that imports of

said woven fabrics of wool weighing 14,000,000 pounds had been reached on July 25, 1957, at 3:07 p. m. eastern standard time. As heretofore stated, the involved merchandise was entered during the calendar year 1957, after July 25, and was assessed under paragraph 1109 (a) of the Tariff Act of 1930 at the ad valorem rate of 45 per centum, plus the specific rate of 37½ cents per pound.

Pursuant to the Trade Agreements Act of 1934, adding section 350 to the Tariff Act of 1930, 19 U.S.C.A. § 1351, certain powers were conferred upon the President in carrying out trade agreements. Section 350(a) of the Tariff Act of 1930, as amended, provides:

"(a) For the purpose of expanding foreign markets for the products of the United States * * * the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States * * * is authorized from time to time—

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. * * * The President may at any time terminate any such proclamation in whole or in part.

* * * * * *

"(c) As used in this section, the term 'duties and other import restrictions' includes (1) rate and form of import duties and classification of articles, and (2) limitations,

prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports."

Our appellate court has recently held that the Trade Agreements Act of 1934, under which the General Agreement on Tariffs and Trade was negotiated and promulgated, was a proper delegation of congressional power to the President. Star-Kist Foods, Inc. v. United States (Bruno Scheidt, Inc., Party in Interest), 275 F.2d 472, 47 CCPA 52, C.A.D. 728, decided December 15, 1959.

The plaintiff, in the case at bar, specifically contends that a rate quota based on domestic production does not fall within any of the categories authorized under the provisions of section 350, supra, in that a rate quota is not (a) a restriction, (b) a modification of existing duties, (c) a modification of existing limitations, or other powers authorized under the statute. However, our courts have recognized that quota restrictions have been authorized by the trade agreements act. In the case of Greene Cattle Company, Inc. v. United States, 36 CCPA 52, C.A.D. 397, the court, at page 57, stated:

"The Reciprocal Trade Agreements Act, supra, gives the President authority to conclude trade agreements with foreign countries and to 'proclaim such modifications of existing duties and *other import restrictions, or such additional import restrictions,* or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder.' [Italics by the court.]

"Subdivision (c) of sec. 350, supra, provides that 'the term "duties and *other import restrictions*" includes (1) rate and form of import duties and classification of articles, and (2) *limitations, prohibitions,*

*charges, and exactions other than duties, imposed on importation or imposed* for the regulation of imports.' [Italics by the court.]

"The trial court held that 'A quota is certainly a limitation on importation and is therefore authorized by the Reciprocal Trade Agreements Act.' With this we agree."

While it is true that the statute (section 350, supra) does not specifically list "reservations" among the negotiating actions which may be proclaimed by the President, there is nothing in the trade agreements legislation, so far as we are able to determine, which would indicate that a modification of duty or change in rate may not be negotiated in such a way that it is conditional or subject to a "reservation." The end result of invoking the reservation here in question was a modification of the rate of duty applicable to the pertinent merchandise, authority for which was given under the negotiated provisions of the trade agreements act, and it is immaterial whether the concessions so given under the trade agreements act are "conditional" or "reserved," so long as the policy objectives of the statute are fulfilled.

It appears pertinent to observe that the wool quota reservation in question was written into the 1947 trade agreement as a part of the concessions granted on paragraphs 1108 and 1109(a) of the tariff act. Accordingly, the wool reservation was an integral part of the duty modifications negotiated with respect to said paragraphs 1108 and 1109 (a). We are of opinion and hold that the President did have authority to invoke and proclaim the reservation contained in paragraph 1108 of the Tariff Act of 1930, as modified, on woven wool fabrics, when he deemed it appropriate to so carry out the negotiated provisions of the 1947 trade agreement.

The plaintiff further contends that, as used in section 350(a) (2), supra, the term "existing" applies not only to "duties and other import restrictions" but also to "limitations." Essentially, in this regard, plaintiff maintains that the President is authorized to proclaim modifications only of existing limitations and that, accordingly, since the wool fabrics reservation was not in existence prior to the negotiation of the 1947 trade agreement, the President had no right or power to invoke the reservation in question. However, as heretofore pointed out, the reservation was an integral part of the then-existing duties in paragraphs 1108 and 1109(a) of the tariff act. There is nothing in the statute itself which specifies the form in which a modification of existing duties may be exercised. The reservation clause incorporated into the duty modifications negotiated with respect to paragraphs 1108 and 1109(a) was a proper exercise of the powers conferred upon the President in negotiating trade agreements. In our opinion, the fact that the wool fabrics reservation did not "exist" prior to the enactment of the 1947 trade agreement does not invalidate the exercise of the power granted the President under the reservation. The net effect of the trade agreement negotiation, of which the reservation was an integral part, was to cause a modification, however conditional, of the then-existing duty treatment of the merchandise covered by paragraphs 1108 and 1109(a) of the tariff act, which modification is clearly authorized under the provisions of the statute.

The plaintiff further contends that, assuming the validity of the wool fabrics reservation, a proclamation is the only authorized notice procedure the President can employ in increasing the duty from 25 per centum to 45 per centum under the reservation. It is maintained, in this connection, that no proclamation was ever made by the President, acting on behalf of the Government under section 350 of the tariff act, as amended, supra, finding that the 1957 imports of woven wool fabrics exceeded 5 per centum of the average annual production of similar domestic fabrics in the 3 preceding years; that no factual quantitative data to support such findings were ever

set forth in a proclamation; that no proclamation was ever made by the President, under said section 350, stating that a quota rate shall apply only to a quantity of 14,000,000 pounds imported in 1957; and, further, that no proclamation was ever made setting forth the date when the quota rate for 1957 terminated, or setting forth the period of time when the quota rate shall continue during 1957.

Counsel for the plaintiff, stressing the language in section 350, supra, giving the President the power "to proclaim * * * such *continuance*, and for such *minimum periods*, of existing customs or excise treatment of any article covered by foreign trade agreements * * *" [italics ours], specifically contends that, as opposed to the requirements set forth in section 350, supra, proclamation No. 3160 of September 1956, makes no reference to the period of time that the 1957 quota shall be effective, and, further, that it does not specify the 1957 import quantities upon which the "existing" treatment shall apply. It is pointed out that the only period of time established herein, in connection with 1957 imports of woven wool fabrics, is contained in the letter from the Commissioner of Customs, dated December 3, 1957, stating that the rate quota quantity was reached on July 25, 1957 (exhibit 4). Counsel maintains that said notification is not a "proclamation," as required by section 350, supra. These contentions will be hereinafter referred to.

The plaintiff, in its brief, maintains that any Presidential proclamation which attempts to set up a quota must contain within itself all factors necessary to establish the quota, arguing, in this connection, that this is not true of the proclamation herein invoking the wool fabrics reservation. In support of this position, our attention is directed to the holding of the court in Greene Cattle Company, Inc. v. United States, 36 CCPA 52, C.A.D. 397. The latter case, however, did not involve any question with reference to the completeness of a proclamation making operative quota provisions. The issue there was whether certain cattle, imported from Mexico during April 1942, were entitled to a reduced rate of duty. Under a trade agreement with Canada and the President's proclamation issued thereunder, there was established a total quota limitation of 225,000 head of cattle, weighing 700 pounds each. In holding that the President, under the powers conferred upon him under section 350 of the Tariff Act of 1930, as amended, supra, had authority to allocate different percentages of that quota to Canada and other countries, the court held that the fact that, during the second quarter of 1942, there was not imported from Canada the total quantity permitted at the reduced rate did not give Mexico or any other country the right to import into the United States at the reduced rate more than the quantity provided for "other foreign countries" for a quarter year period of 1942 in the President's proclamation. Significant, in our opinion, is the fact that the Canadian Trade Agreement there in question contained the formula to be applied in allocating the quota, if such allocation were to be requested. In the case at bar, the proclamation invoking the wool fabrics reservation also sets forth the formula to be used in computing the quota for each calendar year, and, since the quota was to be a percentage of domestic production in prior years, nothing was left to conjecture or speculation. The formula here for determining the quota was spelled out and, while not specifically authorized under the provisions of section 350, supra, was justified because it was "required or appropriate" to carry out the trade agreement herein involved. The only essential distinction, in our opinion, between the proclamation under consideration in the Greene Cattle case, supra, and the proclamation here in question is that, in the cited case, the pertinent proclamation contained a specified numerical basis for the quota, whereas the proclamation here under consideration contains a specified percentage formula for the quota.

This, however, in our opinion, is a distinction without a difference.

■ The fact that, in the case at bar, the quota depends not upon the quantity of merchandise imported but that it depends rather upon the quantity of such merchandise produced in the United States in relation to the amount imported, is not, in our opinion, such a distinction as would invalidate the imposition of the quota here imposed. In United States v. Metropolitan Petroleum Corp., 42 CCPA 38, C.A.D. 567, and United States v. American Bitumuls & Asphalt Co., 246 F.2d 270, 44 CCPA 199, C.A.D. 661, the question involved the rate of tax assessable on importations of certain petroleum. A trade agreement had been concluded with Venezuela wherein the President agreed to reduce the tax, among other things, on imports of petroleum and petroleum products, including fuel oil derived from petroleum, which equaled 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year. The quota in the oil cases cited above, depended, as in the case at bar, upon the quantity of such merchandise produced in the United States in relation to the amount imported. While no question was there raised with respect to the legality of the quota provisions of the Venezuelan Trade Agreement, it was recognized, in those cases, that quota modifications were authorized under the trade agreements act, supra.

■■ We now proceed to a consideration of some of plaintiff's contentions, more specifically that proclamation 3160, supra, is not authority for imposing a quota or a rate quota on 1957 imports of woven wool fabrics. Concededly, in the first instance, the provisions of the General Agreement on Tariffs and Trade, T.D. 51802, specifically with reference to the rate of duty modifications in paragraphs 1108 and 1109(a), supra, and the "NOTE" pertaining thereto, were made effective by Presidential Proclamation No. 2671A of December 16, 1947. Subsequently, the President, on September 28, 1956, issued proclamation No. 3160, supra. In our opinion, the latter proclamation put into operation the reservation contained in the "NOTE" with respect to the rates of duty under paragraphs 1108 and 1109(a), supra, and such increase in rate of duty as so provided was made effective for the period October 1, 1956, to December 31, 1956, and for each calendar year thereafter "until otherwise proclaimed." Proclamation No. 3160 further provided that the increased rate of duty as to the merchandise covered thereby would be applicable to such merchandise in excess of a quantity "notified by the President to the Secretary of the Treaury," and "published in the Federal Register." Notification by the President to the Secretary of the Treasury, setting forth the 1957 quota quantity applicable to products such as here involved, was given, as heretofore noted, on May 24, 1957 (T.D. 54370). Publication as to the quota limitation on imports for the year 1957 was made pursuant to the provisions of proclamation No. 3160 in the Federal Register of May 28, 1957 (22 F.R. 3717). This notification, in our opinion, was sufficient to inform all parties interested that the quota quantity for the calendar year 1957 was 14 million pounds.

■ While counsel for the plaintiff has set forth a number of arguments in support of the various contentions advanced, in our opinion, they failed to overcome the fact that the aforesaid two proclamations, namely, proclamation 2671A and proclamation No. 3160, rendered effective the General Agreement on Tariffs and Trade, T.D. 51802, and the quota reservation contained therein with respect to the relevant paragraphs. Concededly, in order for the reservation to be operative, a proclamation had to be issued invoking it. This, however, was done by proclamation No. 3160, supra. Thereafter, the pertinent tariff quota automatically began to operate, as provided by the said proclamation, at the beginning of each calendar year, starting with the year 1957, and, pursuant to pro-

visions contained in the proclamation itself, the higher rate of duty was to attach as soon as imports of the products in question reached the stated quantity of 5 per centum of domestic production of similar products. Accordingly, in our opinion, once the reservation was rendered operative by proclamation No. 3160, a determination as to what would be the quota quantity in terms of pounds and as to when the quota had been fulfilled were matters of mere statistical computation and required, in our opinion, no further proclamation by the President to make such determinations effective.

Apparently, plaintiff would have us hold that the reservation in question may be invoked only when imports are found to have exceeded the 5 per centum limitation of domestic production in a particular calendar year and such finding is supported by publication of pertinent factual data, and, when in view of such finding, a decision is made to exercise and make operative the reservation. Such a restriction, however, upon the President's authority to act is not, in our opinion, warranted. In view of the reciprocal provisions of the trade agreements act, the Government had the right, without qualification, to increase the duty in any year on imports of subject products in excess of 5 per centum of the average annual domestic production for the preceding 3-year period, and, accordingly, proclamation No. 3160 was something more than merely an expression of an intention to impose a quota on 1957 imports and an expression of an intention to modify the existing 25 per centum duty on 1957 imports.

With respect to plaintiff's contention that no quota was in effect until May 24, 1957, when the President "determined" that there would be a 1957 quota for such goods and that the quota would be 14,000,000 pounds (T.D. 54370), we are of opinion that, if the interpretation for which the plaintiff contends were valid, the right granted by the relevant reservation under the trade agreements act could never be fully exercised. In this connection, we note that "General Note No. 4 of Schedule XX of the General Agreement on Tariffs and Trade," T.D. 51802, which was in effect when the merchandise here under consideration was entered for consumption, reads as follows:

"4. If any tariff quota provided for in this Schedule, other than those provided for in items 771, becomes effective after the beginning of a period specified as the quota year, the quantity of the quota product entitled to enter under the quota during the unexpired portion of the quota year shall be the annual quota quantity less $\frac{1}{12}$ thereof for each full calendar month that has expired in such period."

As pointed out by the defendant, in its brief, if we assume that the applicable quota figured out to 12 million pounds and that this amount was entered during the month of January, then, if the decision to invoke the reservation could not be made until the quota amount had been met, "General Note No. 4," supra, would require that 11 million more pounds (i. e., the 12-million-pound annual quota, less one-twelfth for the expired month of January) be allowed entry at the quota rate before the higher nonquota rate could be applied. In such case, the increased duty would be applicable and could be made effective only after imports amounting to 23 million pounds, or 9.6 per centum of domestic production had been entered. Clearly, such a result would be inconsistent with the intent of the negotiators of the trade agreements act. In our opinion, the fact that a stated quantity of imports must occur before a higher nonquota rate of duty attaches, does not signify that such indicated volume must be entered before a decision to apply the higher rate of duty is made by the President or one acting in authority under the law. Consequently, we conclude that "General Note No. 4," supra, does not affect the situation before us and that the action of the President in this case, in invoking the reservation and setting the quota rate applicable

to goods such as here imported, was valid and within contemplation of the law. For the latter reason, we deem it unnecessary to consider the claim advanced by the plaintiff that, according to "General Note No. 4," supra, there was still an "available" quota of 9,333,333 pounds of woven wool fabrics on May 1, 1957, and that, at the time the merchandise under consideration was entered, namely, on August 13, 1957, such available quota had not been exhausted.

■■■■ Numbered also among the plaintiff's contentions are several others, which we deem worthy of reference and consideration. Plaintiff attacks the validity of proclamation 3160, supra, because it does not specify "any 'minimum period' in 1947 when the 45% rate shall apply." However, the "minimum period" clause in section 350, supra, applies only to a "continuance" of existing customs or excise treatment of any article covered by foreign trade agreements, a situation not prevailing or involved in the case at bar. Plaintiff further claims that the President was without authority to issue a proclamation invoking the wool fabrics reservation for more than 1 year at a time, because section 350, supra, might be amended and, therefore, the President "cannot assume in advance to change a duty every year unless he first determines each year that he is authorized to do so on the basis of the authority delegated then to him by Congress." This contention is without merit. Aside from the fact that the basic authority of the President, under section 350, supra, with respect to proclamations, has not been changed since the Trade Agreements Act of 1934, even if some change were made subsequent to the issuance of a proclamation under the aforesaid section, the new legislation would prevail, in the event of a conflict with the prior proclamation. In the absence of new legislation, there is nothing to prevent the President from proclaiming a duty rate applicable to imported merchandise each year, as was done in this case. Proclamation No. 3160 provides that the wool fabrics reservation should apply in each succeeding year "until otherwise proclaimed." Further, plaintiff, citing the President's authority under section 350, supra, to proclaim modifications of existing duties, indicates that a proclamation carrying into effect the wool fabrics reservation must be based on existing "conditions" in the industry, and that, therefore, a new proclamation would be required each year. Nowhere is the matter of "conditions" covered by the enabling section. There is no connection between "duties" and "conditions," as contemplated by the statute, and plaintiff's contention that invocation of the wool fabrics reservation must be based upon existing "conditions" is also without merit in our present determination.

■■■■ The defendant, in this case, concedes that no production statistics by weight, as called for in the reservation setting up the pertinent quota, were maintained or directly available. While it is further conceded that the fixing of the quota on wool fabrics might have been more precise or accurate, had such statistics been maintained, we do not believe it is within our province to attack the final determination of the President as to what constitutes the applicable quota or the fulfillment thereof with respect to the goods here imported. The President was entrusted with the duty and had the power of adopting such measures to carry out the intent of the negotiators of the trade agreement "as are required or appropriate." In the case at bar, the President determined that 14 million pounds represented a quantity of not less than 5 per centum of the average annual production in the United States during the 3 immediately preceding calendar years of fabrics similar to those imported, and, in accordance with the powers conferred upon him, determined that the 45 per centum rate would be applicable when said quantity had been reached. How he arrived at such determinations or the expediency of the measures taken by him, pursuant to the exercise of powers conferred under the law, which resulted in final action

making applicable the nonquota or increased rate of ad valorem duty to the goods imported, are matters which, in our opinion, are not subject to judicial review.

For the reasons stated aforesaid, we are of opinion and hold that the quota reservation, as contained in the General Agreement on Tariffs and Trade, T.D. 51802, covering merchandise classifiable under paragraphs 1108 and 1109(a) of the tariff act, as amended, was authorized by section 350 of the Tariff Act of 1930, as amended; that said reservation was made effective by Presidential Proclamation No. 2761A, supra; that proclamation No. 3160, supra, was a valid exercise of the powers conferred upon the President and made operative the quota provisions contained in the aforesaid "NOTE" or reservation with respect to the rate of duty applicable to the imported merchandise; and that, accordingly, the involved merchandise is properly dutiable under the relevant paragraph of the tariff act, as amended, as assessed.

The protest herein is overruled. Judgment will issue accordingly.

MOLLISON, Judge (dissenting).

I am compelled to dissent from the conclusions of the majority. To begin with, I believe that the plaintiff was prevented from offering relevant and material evidence bearing on the determination of the quota for woolen fabrics and the proof of its claim. Even in an administrative proceeding, to say nothing of a judicial proceeding such as this one, where testimony is taken, a party must not be prevented from offering relevant and material testimony and evidence; [1] nor must relevant and material evidence be suppressed.[2]

By stipulation, the parties agreed that exhibit 5, which related to the domestic production of woolen and worsted fabrics in the United States and to the method employed in arriving at the 1957 tariff quota, was admitted in evidence. Plaintiff made a motion to admit into evidence exhibits 6, 7, and 8 for identification. Exhibits 6 and 7 for identification were exactly the same kind of public documents as is exhibit 5—i. e., they were issued by the Committee for Reciprocity Information and contained woolen and worsted production statistics used in the determination of the 1957 tariff quota for wool fabrics—and show the production statistics used, respectively, in the determination of the 1956 and 1958 tariff quotas.

Since exhibit 5 concerned the 1957 tariff quota, and since exhibits 6 and 7 for identification related to the 1956 and 1958 tariff quotas, and since as a whole and separately these three documents dealt with the woolen production statistics for the years 1954, 1955, and 1956 or at least one or more of said base years, exhibits 6 and 7 for identification, wrongfully, arbitrarily, and discriminatorily excluded and denied admission by the majority, are connected parts of a whole series of tariff quota documents dealing with domestic production statistics for the years 1954, 1955, and 1956 and should have been received in evidence because the proof and the record of this case has shown their connection and relation.

Since the defendant offered exhibit 5 to sustain the tariff quota for the year 1957, consideration should also have been given to exhibits 6 and 7 for identification and other exhibits, offered by the plaintiff, which offered exhibits challenged the accuracy and truth of the domestic production figures used in determining the 1957 tariff quota for woolen and worsted fabric production, especially where it is shown by exhibits 6 and 7 for identification that the produc-

---

1. Cf. Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369. If the review is judicial, the parties have a right to introduce evidence in support of their claim of constitutional right. Crowell v. Benson, 285 U.S. 22, 46, 52 S.Ct. 285, 76

L.Ed. 598; Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908.

2. Cf. Kwock Jan Fat v. White, 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010.

tion statistics used in determining the 1957 tariff quota were incorrect and inaccurate.[3]

Moreover, exhibit 6 for identification on its face purported to explain the methods used in arriving at the figures for the years 1953, 1954, 1955, and 1956; and exhibit 7 for identification *on its face purported to explain errors and revisions* of annual domestic woolen production statistics used in calculating tariff quotas and *changes* in the figures given in the release of the Committee for Reciprocity Information of May 28, 1957, pertaining to the 1957 tariff quota.[4]

Fairness and justice dictated that, under the above circumstances, plaintiff's exhibits 6 and 7 for identification should have been received in evidence in order to allow plaintiff to prove that the woolen production statistics used to calculate the 1957 woolen quota were incorrect and inaccurate and thus to show that its imported woolen fabrics were entitled to the benefit of the lower trade agreement rate. Refusal to admit plaintiff's exhibits 6 and 7 for identification in evidence was a denial of due process of law and equality of treatment and violated the fifth amendment to the Federal Constitution.

Plaintiff's exhibits 6 and 7 for identification were properly admissible in evidence because said two exhibits tended to prove that the figures used by the President were unreliable or untrustworthy or certainly incorrect or inaccurate and, as a consequence, might furnish no lawful basis for determining the wool fabric quota.

In considering the admissibility of exhibits 6 and 7 for identification, the majority opinion overlooked the fact that said two proffered exhibits are official public documents, issued by the Committee for Reciprocity Information, and containing, respectively, production statistics for the years 1953, 1954, and 1955, and for the years 1955, 1956, and 1957, each proffered exhibit containing, respectively, woolen production statistics for two of the base years, and *together* containing woolen production statistics for 1954, 1955, and 1956, which might have been used in the determination of the tariff quota for woolen fabrics in the year 1957.

Since exhibits 6 and 7 for identification related to and mentioned woolen production figures similar to those contained in exhibit 5 and were the same kind of official public documents dealing with wool fabric quotas, and since exhibit 6 for identification implies and exhibit 7 for identification expressly states that there were errors, differences, changes, and discrepancies in the woolen production statistics on which the 1957 tariff quota was based, it would certainly seem that the offered exhibits would have been very relevant, pertinent, and material for the purpose of discrediting the woolen production statistics or figures used in determining the 1957 quota, and certainly admissible for the purpose of *explaining* the woolen production statistics contained in exhibit 5.[5]

3. Crawford v. United States, 212 U.S. 183, 199, 200, 201, 202, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; Warfield v. Wire Wheel Corporation of America, 107 Misc. 528, 177 N.Y.S. 733, affirmed 191 A.D. 899, 180 N.Y.S. 957; Grattan v. Metropolitan Life Ins. Co., 92 N.Y. 274, 284, 44 Am. R. 372; Southern Pacific Co. v. Stephany, 9 Cir., 255 F. 679; Sturgis v. Baker, 39 Or. 541, 65 P. 810; 31 C.J.S. Evidence § 190, page 917, note 82; College Inn Food Products Co. v. Loudon Packing Co. et al., 7 Cir., 65 F.2d 883; National Live Stock Credit Corporation, etc. v. Thompson, 10 Cir., 76 F.2d 696; Jones, Evidence, 5th edition, volume 1, page 352, section 201; 20 Am.Jur., Evidence, section 275.

4. Crawford v. United States, supra; Warfield v. Wire Wheel Corporation of America, supra, affirmed 191 A.D. 899, 180 N.Y.S. 957; Grobelny v. W. T. Cowan, Inc., 2 Cir., 151 F.2d 810; Southern Pacific Co. v. Stephany, 9 Cir., 255 F. 679; Sturgis v. Baker, supra; 31 C.J.S. Evidence § 190, page 917, note 83; Am. Jur., Evidence, section 275.

5. Crawford v. United States, 212 U.S. 183, 199, 200, 201, 202, 29 S.Ct. 260, 53 L. Ed. 465; Warfield v. Wire Wheel Corporation of America, supra; Sturgis v.

In the furtherance of justice, the evidentiary rule of completeness demanded the introduction in evidence of exhibits 6 and 7 for identification, said documents being, respectively, the 1956 and 1958 tariff quota documents for wool fabrics, and containing domestic woolen production statistics, among other things, for the years 1954, 1955, and 1956, and being so related on their face to exhibit 5 that their introduction in evidence was essential for an adequate understanding of exhibit 5.[6]

In a judicial proceeding, as here, a party is entitled to introduce evidence in support of his contentions and claims.[7] Plaintiff's exhibits 6, 7, and 8 for identification were relevant, were material, were of probative value, and had the capability of properly influencing the result of the trial. It is apparent that plaintiff's exhibits 6, 7, and 8 for identification constituted all the evidence that the plaintiff would offer to prove its case. The rejection of this relevant and material evidence was prejudicial[8] to the plaintiff and would, in substance and effect, deny the plaintiff its day in court and deprive it of due process of law in violation of the fifth amendment to the Federal Constitution.[9]

Alternatively, plaintiff claimed that the shipment here under protest was imported before the 1957 tariff quota for woolen fabrics was exhausted.[10] The plaintiff claimed that the 1957 woolen fabric tariff quota was not "in effect" on January 1, 1957; nor was it "in effect" in February, March, or April of that year; that the President was under no compulsion to set up a quota in 1957 nor proclaim such a quota, nor to determine the amount of the quota; and, in any event, no quota was "in effect" or proclaimed until May 24, 1957, the date when the President determined that there would be a 1957 quota and that the quota would be 14,000,000 pounds.

Plaintiff contended that exhibit 8 for identification established that, during the period from May 1, 1957, through August 31, 1957, a total of only 7,792,921 pounds of quota woolen fabric was entered for consumption into the United States, and, as a consequence, the available woolen quota of 9,333,333 pounds for the year 1957 had not been reached on the date of the importation of the plaintiff's merchandise. Plaintiff's exhibit 8 for identification would tend to prove that the available quota was not exhausted on the date when plaintiff's merchandise was imported. It was admitted by defendant's attorney that the figures contained in exhibit 8 for identification for wool fabric imports in pounds and the total figures contained therein in respect to amounts in pounds for the respective months of May, June, July, and August and the aggregate total for the 4 months of 1957 were proper and correct domestic woolen poundage statis-

Baker, supra; Grobelny v. W. T. Cowan, Inc., 2 Cir., 151 F.2d 810; Southern Pacific Co. v. Stephany, supra; 20 Am.Jur., Evidence, section 275; 31 C.J.S. Evidence section 190, page 917, notes 82, 83.

6. Warfield v. Wire Wheel Corporation of America, 107 Misc. 528, 177 N.Y.S. 733, affirmed 191 A.D. 89, 180 N.Y.S. 957; Sturgis v. Baker, 39 Or. 541, 65 P. 810; Grattan v. Metropolitan Life Ins. Co., 92 N.Y. 274, 284, 44 Am.R. 372; Chamberlayne, Modern Law of Evidence (1911), volume 1, sections 488, 520, 522, 523.

7. Chicago Junction case, 264 U.S. 258, 265, 44 S.Ct. 317, 320, 321, 68 L.Ed. 667, 674; Walker Mining Co. v. Industrial Accident Commission et al., 35 Cal.App.2d 257, 95 P.2d 188, 190; State v. Sax, 231 Minn. 1, 42 N.W.2d 680, 690; Cary v. Corporation Commission of Oklahoma, D.C., 9 F.Supp. 709, 711.

8. Nussbaum v. Atlas Laundry Co., Inc., 6 Cir., 10 F.2d 353.

9. Chicago Junction case, 264 U.S. 258, 265, 44 S.Ct. 317, 320, 321, 68 L.Ed. 667, 674; Walker Mining Co. v. Industrial Accident Commission et al., supra; State v. Sax, supra; Cary v. Corporation Commission of Oklahoma, supra.

10. Liquidation upon certain quota merchandise without allowance for the reduction granted by the applicable trade agreement is illegal, where the record discloses that entry was duly made during the period within which the reduced rate was applicable. Esso Standard Oil Company v. U. S., 30 Cust.Ct. 111, CD 1506.

tics. See transcript pages 33, 34, 35, and 36. Exhibit 8 for identification had the capability of properly influencing the result of the trial; said proffered exhibit was, therefore, material and had probative value.[11] In view of the admission that the domestic woolen poundage statistics contained in said exhibit for identification were proper and correct, the things which said exhibit 8 for identification tended to show should have been carefully considered in order to decide fairly the merits of this case. The woolen production poundage statistics contained in said exhibit 8 for identification were of substantial probative value and weight and ought to have been considered in the determination of the issues in the case.[12]

The rejection of plaintiff's relevant and material evidence, in substance, denied the plaintiff its day in court and deprived it of due process of law in violation of the fifth amendment to the Federal Constitution. The provisions in the statutes and the rules of court for a hearing imply both the privilege of introducing evidence and the duty of the court to decide in accordance with the evidence.[13] The plaintiff had the benefit of the form of judicial proceeding, but the rejection of its exhibits 6, 7, and 8 for identification denied it the substance of due process and a fair hearing.

The majority concludes, at page 57 of its opinion:

"* * * Accordingly, in our opinion, once the reservation was rendered operative by proclamation No. 3160, a determination as to what would be the quota quantity in terms of pounds and as to when the quota had been fulfilled were matters of mere statistical computation and re-

quired, in our opinion, no further proclamation by the President to make such determinations effective.

"Apparently, plaintiff would have us hold that the reservation in question may be invoked only when imports are found to have exceeded the 5 per centum limitation of domestic production in a particular calendar year and such finding is supported by publication of pertinent factual data, and, when in view of such finding, a decision is made to exercise and make operative the reservation. Such a restriction, however, upon the President's authority to act is not, in our opinion, warranted. In view of the reciprocal provisions of the trade agreements act, the Government had the right, without qualification, to increase the duty in any year on imports of subject products in excess of 5 per centum of the average annual domestic production for the preceding 3-year period, and, accordingly, proclamation No. 3160 was something more than merely an expression of an intention to impose a quota on 1957 imports and an expression of an intention to modify the existing 25 per centum duty on 1957 imports."

I cannot agree especially with the view that because of the reciprocal provisions of the trade agreement act, "the Government had the right, *without qualification* [emphasis supplied], to increase the duty in any year on imports of subject products in excess of 5 per centum of the average annual domestic production for the preceding 3-year period." Under this view, the customs officials and other officers of the Government have an un-

---

11. Torrey v. Congress Square Hotel Co., 145 Me. 234, 75 A.2d 451, 456.

12. Torrey v. Congress Square Hotel Co., supra; Chicago Junction case, 264 U.S. 258, 265, 44 S.Ct. 317, 321, 68 L.Ed. 667, 674.

13. Chicago Junction case, 264 U.S. 258, 265, 44 S.Ct. 317, 321, 68 L.Ed. 667, 674; Truax v. Corrigan, 257 U.S. 312,

331, 332, 42 S.Ct. 124, 66 L.Ed. 254; Walker Mining Co. v. Industrial Accident Commission et al., 35 Cal.2d 257, 95 P.2d 188, 190; State v. Sax, 231 Minn. 1, 42 N.W.2d 680, 690; Cary v. Corporation Commission of Oklahoma, D.C., 9 F.Supp. 709, 711; Crowell v. Benson, 285 U.S. 22, 46, 52 S.Ct. 285, 76 L.Ed. 598; Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908.

fettered right, under the reservation, to increase the duty in any year on imports of subject products in excess of 5 per centum of the average annual domestic production for the 3-year period. Under this view, the customs officials and Government officers might, without qualification, i. e., without *condition* or *limitation*, increase the duties on woolen fabrics under the color or guise of applying a higher quota rate. There is nothing in the trade agreements act which authorizes arbitrary or discriminatory application of customs duty rates or unfair, unequal, or discriminatory treatment of an importer, as plaintiff here.[14]

The majority says:

" * * * Accordingly, in our opinion, once the reservation was rendered operative by proclamation No. 3160, a determination as to what would be the quota, quantity in terms of pounds and as to when the quota had been fulfilled were matters of mere statistical computation and required, in our opinion, no further proclamation by the President to make such determinations effective."

Plaintiff contends that the reservation and the higher nonquota rate would only become effective when the President had determined that 5 per centum of the average annual domestic production of similar woolen fabrics for a 3-year period had been imported in any one calendar year and that fact determined by the President. The majority, as shown by the quotation from its opinion, believes that the customs officials and/or certain officers of the Government (not the President) or even employees may determine the fact. I do not believe that the trade agreements act permits the Secretary of the Treasury, or the Commissioner of Customs, or other customs officials to determine the quota quantity or when the quota had been fulfilled. According to the majority, these important factors contained in the reservation to the General Agreement on Tariffs and Trade, an international trade agreement between the United States and many foreign nations, were matters of mere statistical computation and required no proclamation by the President to make such determinations effective. It is implied that minor governmental officials or even employees might make the determination as to what would be the quota quantity and when the quota had been fulfilled and the higher quota rate would become effective, and, further, that the matter of carrying out an important provision of an international trade agreement was a matter of minor statistical computation.

It should be pointed out that there was error, doubt, uncertainty, and confusion in connection with the domestic woolen production figures and the production statistics, on the basis of which the 1957 quota was based; and that it was under such circumstances that the majority unconstitutionally and wrongfully excluded plaintiff's evidence offered to support its claims concerning the correct quota quantity and the amount of woolen fabrics which had been imported at the time of the importation of plaintiff's merchandise, the plaintiff making the alternative claim that, at the time of plaintiff's importations, the quota quantity had not been exhausted.

The plaintiff contends that the President is authorized, under section 350, as amended by the Trade Agreements Extension Act of 1955 (19 U.S.C.A. § 1351 (a) (1) (B)) to issue a proclamation to proclaim such modifications of existing duties and other import restrictions as are required or appropriate to carry out the reservation contained in the note to the General Agreement on Tariffs and Trade. But plaintiff contends that the aforesaid section authorizes the President to proceed only by issuance of a proclamation. The section does not authorize the President to act in any other way, nor does it authorize any other person or officer to do anything required or

14. Truax v. Corrigan, 257 U.S. 312, 331–339, 42 S.Ct. 124, 66 L.Ed. 254; Yick

Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220.

appropriate to carry out any foreign trade agreement that the President has entered into under said section.

The wool fabrics reservation to the General Agreement on Tariffs and Trade conferred a privilege of withdrawing a tariff concession therein made where imports into the United States of similar woolen fabrics exceeded 5 per centum of the average annual production for a 3-year period, but the withdrawal of the concession and the exercise of the privilege of raising the ad valorem rate to 45 per centum were not mandatory and, therefore, the duty did not automatically go up to 45 per centum—the rate provided in the reservation. As pointed out by the plaintiff, the reservation is not itself a quota, but merely a privilege which, under a certain named condition, the United States was allowed to exercise if it chose to do so.

To comply with the statute section 350, as amended, it seems reasonable to interpret the statute as requiring that there must be a decision by the President finding that the prescribed conditions exist, i. e., that the imports of similar woolen fabrics exceeded 5 per centum of the average annual production of similar fabrics during the 3 immediately preceding calendar years; and, secondly, that the United States had exercised its option to increase the duty to 45 per centum ad valorem duty. The Government gave foreign Governments notice of its option, but it does not seem that the President ever made a proclamation under section 350, as amended, finding that the imports exceeded 5 per centum of the average annual production of similar domestic fabrics in the years 1954, 1955, and 1956. No other procedure, except by proclamation by the President, is au-

thorized by the statute nor is procedure by other Government officers authorized.

Plaintiff further contends that any proclamation proclaiming modifications of existing duties and other import restrictions, or such additional restrictions, or such continuance, must be confined and limited "for such minimum periods" and must not be for *indefinite* periods of time, as was provided in proclamation No. 3160, which provided *"until otherwise proclaimed"* [italics supplied] the ad valorem rate which shall be applied to said fabrics, entered or withdrawn from warehouse, in excess of a quantity shall be 45 per centum ad valorem.[15]

Plaintiff argues that the proclamation goes beyond the legislative limits contained in the statute, because the rate proclaimed in proclamation No. 3160 is proclaimed to be in effect *indefinitely*, regardless of what may be the amount of woolen fabrics imported into the United States and/or regardless of the amount of similar woolen poundage production for any succeeding calendar years. Under these circumstances, Presidential Proclamation No. 3160 was without authority of law and goes beyond the limits of said section 350, as amended, and is illegal and invalid.[16]

I believe that the plaintiff has not had its day in court and that it has been denied a fair trial and a constitutional right to introduce relevant and material evidence in support of its claim.

I believe, also, that the plaintiff has been denied a right to introduce evidence to prove that the purported quota amount of 14,000,000 pounds had not been exhausted at the time of the importation of the plaintiff's goods. I dissent from the conclusion that plaintiff's protest should be overruled.

15. T.D. 54212, vol. 91, Treasury Decisions, p. 351, at p. 354, recital in par. 1.

16. Carl Zeiss, Inc. v. U. S., 23 CCPA 7, TD 47654, 76 F.2d 412; The Best Foods, Inc. v. U. S., 39 CCR 305, CD 1945, aff'd

in United States v. The Best Foods, Inc., 47 CCPA 163, CAD 751, 158 F.Supp. 583. Compare U. S. v. Schmidt Pritchard & Co., 47 CCPA 152, CAD 750, aff'g 41 CCR 108, CD 2029, cert. den., 364 US 919, 5 L.Ed. (2d) 259, 81 S.Ct. 283.