INTER MARITIME FORWARDING CO., INC. v. UNITED STATES (No. 5107) *

United States Court of Customs and Patent Appeals, June 11, 1964

*Allerton deC. Tompkins,* for appellant.

*John W. Douglas,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *Glenn E. Harris,* for the United States.

[Oral argument April 6, 1964 by Mr. Tompkins and Mr. Harris]

Before WORLEY, Chief Judge, and RICH MARTIN, SMITH, and ALMOND, Jr., Associate Judges

SMITH, Judge, delivered the opinion of the Court:

This appeal is from a decision and judgment of the Customs Court, 48 Cust. Ct. 80, C.D. 2318, which overruled, by a divided court, appellant's protest to a decision of the Collector of Customs.

### Factual Background

The subject merchandise is imported from England and consists of woven woolen fabrics weighing over four ounces per square yard. Appellant, the importer, does not challenge the classification of the

goods under paragraph 1109(a) of the Tariff Act of 1930 (as modified by GATT, T.D. 51802), which reads as follows:

Woven fabrics, weighing more than four ounces per square yard, wholly or in chief value of wool, regardless of value_____ 37½¢ per lb. and 25% ad val.

The Collector, for reasons hereinafter discussed, assessed duty at 37½¢ per pound plus 45% ad val. Appellant contends the additional 20% assessment in the ad valorem portion of the duty is unlawful.

Prior to 1948, under original paragraph 1109(a) of the 1930 Act, goods such as the subject merchandise were dutiable at 50¢ per pound plus an ad valorem percentage rate which varied according to the value per pound of the fabrics. Effective January 1, 1948, the rate was modified to 37½¢ per pound plus 25% ad val., pursuant to the inclusion of paragraph 1109(a) in Schedule XX of GATT (as proclaimed by the President on December 16, 1947, 82 Treas. Dec. 305, T.D. 51802). Also included in Schedule XX of GATT, however, accompanying paragraph 1108, was the following "NOTE," popularly known as the Wool Fabrics Reservation:

NOTE: The United States reserves the right to increase the ad valorem part of the rate applicable to any of the fabrics provided for in item 1108 or 1109(a) of this Part to 45 per centum ad valorem on any of such fabrics which are entered in any calendar year in excess of an aggregate quantity by weight of 5 per centum of the average annual production of similar fabrics in the United States during the 3 immediately preceding calendar years.

On September 28, 1956, the President issued the following proclamation (No. 3160, T.D. 54212) which invoked the Wool Fabrics Reservation for the remaining three months of 1956 and for each calendar year thereafter, until otherwise proclaimed:

* * * 7. WHEREAS I find that upon invocation of the said [Wool Fabrics] reservation set forth in the second recital of this proclamation, effective October 1, 1956, it will be appropriate to carry out the trade agreement specified in the first recital of this proclamation that the ad valorem part of the rate be 45 per centum ad valorem in the case of any of the fabrics described in the said item 1108 or 1109(a) in Part I of Schedule XX to the General Agreement on Tariffs and Trade set forth in the second recital of this proclamation * * *:

(a) during the period from October 1, 1956, to December 31, 1956, both inclusive, if such fabrics are entered, or withdrawn from warehouse, for consumption after the total aggregate quantity of 3,500,000 pounds of such fabrics has been so entered or withdrawn; which quantity I find to be not less than 1¼ per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics; and

(b) following December 31, 1956, until otherwise proclaimed by the President, if such fabrics are entered, or withdrawn from warehouse, for consumption in any calendar year after that total aggregate quantity by weight of such fabrics which shall have been notified by the President to the Secretary of the Treasury,

and published in the FEDERAL REGISTER, has been so entered or withdrawn during such calendar year; which quantity the President shall have found to be not less than 5 per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics;

\* \* \* \* \* \* \*

Now, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under and by virtue of the authority vested in me by the Constitution and the Statutes, including the said section 350 of the Tariff Act of 1930, as amended, do proclaim as follows:

1. In order to carry out the said trade agreements specified in the first and third recitals of this proclamation, until otherwise proclaimed by the President, the ad valorem part of the rate which shall be applied to the said fabrics described in the seventh recital of this proclamation, entered, or withdrawn from warehouse, for consumption in excess of the quantity specified in clause (a) of that recital, or in excess of a quantity notified to the Secretary of the Treasury pursuant to clause (b) of that recital, shall be 45 per centum ad valorem. \* \* \*

In essence, this proclamation did (or, as appellant would have it, *purported* to do) several things: 1) it invoked the reservation and ordered that the ad valorem portion of the rate specified in paragraph 1109(a) would be 45% whenever the total annual importation of fabrics exceeded the 5% quota contained in the reservation; 2) it announced that the 5% quota for the last quarter of 1956 was 3,500,000 pounds (or, in other words, that 5% of the average annual domestic production during the three calendar years immediately preceding 1956 was not greater than 14,000,000 pounds); and 3) it stated that for each year subsequent to 1956, the President would set a quota, not less than 5% of the average annual domestic production during the three immediately preceding calendar years, and would notify the Secretary of the Treasury of such quota, such notification to be published in the Federal Register.

On May 24, 1957, the President transmitted the following notification to the Secretary of the Treasury (92 Treas. Dec. 122, T.D. 54370):

\* \* \* Pursuant to paragraph 1 of that proclamation [No. 3160, supra] I hereby notify you that for the calendar year 1957 the quantity of such fabrics on imports in excess of which the ad valorem part of the rate will be 45 per centum ad valorem shall be 14,000,000 pounds. *I find this quantity to be not less than 5 per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics.* \* \* \* [Emphasis added.]

This notification was published in the Federal Register under date of May 28, 1957 (22 F.R. 3717). Subsequent to such publication there was a series of communications between the Commissioner of Customs and the Collector, indicating that the 1957 quota of 14,000,000 pounds probably would be reached on July 24 or 25, and outlining a collection procedure to be followed after those dates which required a deposit

by the importer of the extra 20% differential in the ad valorem portion of the rate. Finally, on December 3, 1957, the Commissioner notified the Collector at New York that the quota of 14,000,000 pounds had been filled on July 25, 1957 at 3:07 p.m. E.S.T. and that the increased rate of 45% ad valorem should be collected on all entries and withdrawals for consumption made after that time.

Since the merchandise in this case was entered after July 25, 1957, it was assessed at the increased ad valorem rate of 45%. Appellant protests the assessment at the increased rate as unlawful and, in so doing, challenges not only the authority of the President to take the actions outlined above, but also the manner in which that authority was implemented. Insofar as possible, we shall treat appellant's contentions separately.

### Delegation and Scope of Authority

In *Panama Refining Co.* v. *Ryan*, 293 U.S. 388 (1935), the Supreme Court invalidated a provision of the National Industrial Recovery Act which delegated to the President the power to prohibit shipment of "hot oil" in interstate commerce. Speaking for the majority, Mr. Chief Justice Hughes wrote:

The Constitution provides that "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Art. I. § 1. And the Congress is empowered "To make all laws which shall be necessary and proper for carrying into execution" its general powers. Art. I, § 8, par. 18. The Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility. But the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained.

We quote this passage because we believe it constitutes a lucid expression of the broad outlines of public policy and constitutional authority which govern congressional delegations of power. In deciding whether the delegation of authority to the President was lawful in the present case, we must balance the necessity for administrative flexibility on the one hand against the need for proper guidelines on the other. There can be no abdication by Congress of

its "essential legislative functions," but zeal in assuring this fundamental and necessary limitation cannot be permitted to result in undue restrictions on the power of Congress lawfully to make what it considers to be equally necessary delegations of authority.

Section 350 of the Tariff Act of 1930, as it read at the time of the negotiation of the Wool Fabrics Reservation, provided:[1]

SEC. 350. (a) For the purpose of expanding foreign markets for the products of the United States * * * by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. * * *

\* \* \* \* \* \* \*

(c) As used in this section, the term "duties and other import restrictions" includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.

Appellant does not appear to contend seriously that section 350 is per se unconstitutional. To the extent appellant's position raises such an issue, it must fall in view of our decision in *Star-Kist Foods, Inc.* v. *United States,* 47 CCPA 52, C.A.D. 728, where this court expressly held that section 350 "does not grant an unconstitutional delegation of authority to the President." This decision was reached only after an exhaustive review and comparison of several cases in which the Supreme Court had dealt with comparable enactments delegating authority to the President in tariff matters.[2]

Thus ▮ we may accept as established law that, as a general proposition, section 350 is in harmony with the constitutional safeguards inherent in our traditional concept of separation of powers. Appellant's principal contention thus must be that section 350 is not in itself defective, but rather that the operative provisions of the Wool Fabrics

---

[1] Section 350 was added to the 1930 Act by the Trade Agreements Act of 1934, 48 Stat. 943, as amended, 57 Stat. 125 (1943), 59 Stat. 410 (1945).

[2] E.g., *J. W. Hampton & Co.* v. *United States,* 276 U.S. 394 (1928) : *Field* v. *Clark,* 143 U.S. 649 (1892).

Reservation are beyond the scope of permissible measures which the President is authorized to adopt under the guidelines contained in section 350. Therefore, we must first determine whether the Wool Fabrics Reservation is authorized by section 350.

In essence, the Wool Fabrics Reservation is a rate modification conditioned upon the filling of a quota, the quota being defined as a specified percentage of average annual domestic production over a three-year period. Appellant argues that the President "was not specifically authorized," by section 350, to make such a conditional rate modification, because:

* * * No reference is made to domestic production; the terms "quantity" and "volume" are not mentioned as reasons for making a tariff concession. Such things are not included among the Congressional authorizations to the President to make or terminate a duty rate or a restriction under the trade agreement procedure.

A rate quota as set up under the Wool Fabrics Reservation is neither a duty modification, nor an import restriction. It can only be regarded as an abnormal, irregular or peculiar combination of both of these things; and such a combination is not specifically authorized by Congress. Moreover, the contingent invocation of this strange concoction for woven wool fabrics is predicated upon percentages of domestic quantities, a factor not mentioned in the law as a reason for changing or modifying a duty rate under the trade agreement procedure.

The President had no reason or excuse to select a percentage of U.S. production as his guideline, and we submit that his attempt to clothe himself with this guideline as an excuse for assuming a legislative function is quite unconstitutional.

Appellant, however, has not cited a case, nor have we been able to find one, which holds or even intimates that a rate modification conditioned on the filling of a production quota is beyond the scope of permissible presidential action under section 350. Instead, appellant merely cites, with no attempt at analysis, a line of decisions from both the Supreme Court and this court which develop this sound legal pattern: that congressional delegations are held lawful in the great majority of cases; that the pivot on which the whole delegation problem turns is the limitation of a prescribed legislative standard; and that courts recognize that often the most effective method for expression of legislative will must necessarily be delegation of legislative power. These decisions show, as one commentator [3] points out, that:

* * * our courts today refuse to invalidate legislation merely because it, in form, delegates legislative power to administrative authorities. The approach to the delegation problem has shifted from one of formal application of an inflexible maxim against delegations of legislative power to one of determining whether the legislative grant of authority is in fact inordinate. And with this, the

---

[3] Schwartz, A Decade of Administrative Law, 51 Mich. L. Rev. 775, 778 (1953). For an exhaustive treatment of the entire delegation problem see Davis, Administrative Law 41–88 (1951).

focus of judicial inquiry has centered upon the adequacy of the standards contained in enabling legislation.

Under American theory, grants of authority to the executive branch must be limited by prescribed standards. The discretion conferred must not be so wide that it is impossible to discern its limits. There must be an ascertainable legislative intent to which the exercise of the delegated power must conform. To this extent only is there meaning in the maxim against delegation——that delegation must not amount to an abdication of the legislative function.

Recent federal statutes generally make use of broad, general standards rather than prescriptions of detail. It has been felt that, if the legislature were required to specify with minute particularity the course to be followed by the administration, much of the advantage of delegation would be lost. * * *

Or, as Mr. Justice Burton put it, ■ "It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." [4] We think there can be no doubt that we are here dealing with such a field.

This court has, at least three times, had occasion to consider quota systems promulgated under section 350 which were very similar to the one now before us. In *United States* v. *American Bitumuls & Asphalt Co.*, 44 CCPA 199, C.A.D. 661, the facts were as follows: Prior to the enactment of section 350 the existing duty rate on imported crude petroleum was ½¢ per gallon. After the addition of section 350 to the Tariff Act of 1930, and pursuant to its broad delegation of authority, the President negotiated a trade agreement with Venezuela whereby the rate was reduced to ¼¢ per gallon. The agreement contained a proviso, however, which limited the amount of imported crude petroleum which could qualify for the rate reduction. As to all importations *in excess of 5% of domestic production in the preceding calendar year*, the rate remained at ½¢ per gallon. The issue involved a provision of section 350 which is not pertinent here. No challenge was made regarding the lawfulness of a quota system under section 350 and the court made no comment in that respect. To the same effect see *United States* v. *Metropolitan Petroleum Corp.*, 42 CCPA 38, C.A.D. 567.

In *Greene Cattle Co.* v *United States*, 36 CCPA 52, C.A.D. 397, the situation was similar. The existing rate of duty on cattle weighing seven hundred pounds or more each had been 3¢ per pound. Pursuant to section 350, the President negotiated a trade agreement with Canada whereby the rate was reduced to 1½¢ per pound. The agreement also contained a provision, however, whereby the old rate of 3¢ per pound was to apply to all importations of cattle in excess of a certain specified amount by weight in any calendar year. Again the decision

---

[4] *Lichter* v. *United States*, 334 U.S. 742, 785 (1948).

turned on a provision of section 350 not here pertinent. However, the court felt it appropriate to comment (36 CCPA at 57):

The trial court held that "A quota is certainly a limitation on importation and is therefore authorized by the Reciprocal Trade Agreements Act [section 350]." With this we agree.

Thus, although a quota system promulgated pursuant to section 350 has never before been *directly* challenged as unlawful in this court, we think these cases indicate that quota systems have long been considered harmonious with the policy guidelines set forth in section 350. As further evidence of this, we quote from H.R. Rep. No. 594 (1945), in which the House Committee on Ways and Means, in reporting the bill which led to the 1945 amendments to section 350, stated:

One of the most striking features of the trade-agreements program, as is apparent from any fair analysis of the agreements, is the extreme care which the President and the trade-agreements organization have taken in protecting the interests of American producers. In cases where it appears that some concession is desirable but that an unrestricted concession might cause damage, the concessions actually made have been definitely limited. Pursuant to the wise authority conferred by the original act not only to proclaim changes in restrictions, concessions have been circumscribed, wherever necessary, by reclassifications, changes in form of duties, tariff quotas, and absolute quotas. It is the intent of the law, and also that of the committee, that these same protective measures shall be used in connection with future agreements whenever circumstances require them.

As appellee puts it, "a clearer expression of Congressional intent to authorize the President to employ such devices as are evident in this record would be difficult to imagine."

Accordingly, we agree with the majority of the court below, that:

While it is true that the statute (section 350, supra) does not specifically list "reservations" among the negotiating actions which may be proclaimed by the President, there is nothing in the trade agreements legislation, so far as we are able to determine, which would indicate that a modification of duty or change in rate may not be negotiated in such a way that it is conditional or subject to a "reservation." The end result of invoking the reservation here in question was a modification of the rate of duty applicable to the pertinent merchandise, authority for which was given under the negotiated provisions of the trade agreements act, and it is immaterial whether the concessions so given under the trade agreements act are "conditional" or "reserved," so long as the policy objectives of the statute are fulfilled.

It appears pertinent to observe that the wool quota reservation in question was written into the 1947 trade agreement as a part of the concessions granted on paragraphs 1108 and 1109(a) of the tariff act. Accordingly, the wool reservation was an integral part of the duty modifications negotiated with respect to said paragraphs 1108 and 1109(a). We are of opinion and hold that the President did have authority to invoke and proclaim the reservation contained in paragraph 1108 of the Tariff Act of 1930, as modified, on woven wool fabrics, when he deemed it appropriate to so carry out the negotiated provisions of the 1947 trade agreement.

### Implementation of Authority

It is certainly true, as appellant contends, that invocation by the President of the Wool Fabrics Reservation must be by proclamation; such is the explicit requirement of section 350. In view of this requirement, appellant argues that Presidential Proclamation No. 3160, supra, was defective in several respects and thus failed properly to invoke the Reservation.

First, appellant urges that the rate quota for 1957, which is the pertinent year here, was never put into effect by a proclamation. This is so, says appellant, because Proclamation No. 3160 specified a quota *amount* (3,500,000 pounds) only for the last quarter of 1956; the portion of the proclamation purporting to invoke the Reservation for 1957 and all subsequent years was *in futuro* and thus, unlawful. In essence, appellant contends that the Wool Fabrics Reservation must be invoked each year by a separate proclamation. We cannot agree.

The portion of Proclamation No. 3160 relating to 1957 and all subsequent years clearly provided that the President would, each year, determine a quantity by weight which would be not less than 5% of the average annual domestic production of similar fabrics during the three immediately preceding calendar years; that he would give notification of this quantity to the Secretary of the Treasury; and that the ad valorem component of the duty rate would be 45% as to all such imported fabrics entered or withdrawn for consumption in excess of that quantity. Such a determination was made (T.D. 54370, supra) and notification of it given to the Secretary of the Treasury and published in the Federal Register. Nothing then remained for the President to do.

In our opinion, the above proclamation was clear and unambiguous, and the President fully carried it out. We can perceive no reason why the President should be required to make a separate proclamation for each year in order to invoke the Reservation. Certainly the well-recognized and desirable goals of administrative flexibility and expediency cannot be harmonized with such a strict limitation on the President's permissible sphere of action.

Appellant further argues that the 1957 rate quota became effective no earlier than May 24, 1957, the date on which the notification was sent to the Secretary of the Treasury. In support of this contention appellant cites General Note 4 of Schedule of GATT (T.D. 51802 at p. 316), which provides:

4. If any tariff quota provided for in this Schedule, other than those provided for in items 771, becomes effective after the beginning of a period specified as the quota year, the quantity of the quota product entitled to enter under the quota during the unexpired portion of the quota year shall be the annual quota

quantity less $\frac{1}{12}$ thereof for each full calendar month that has expired in such period.

Appellant points out that this procedure was followed with respect to the last quarter of 1956 and argues that the same pro rata allocation of quota quantity should be applied to 1957, taking May 24 as the effective date. It should, however, be noted that Proclamation 3160 in terms directed that the effective date for the 1956 quota be October 1. No such limitation was set forth for 1957 and subsequent years. We think the reasonable meaning is that the quota for 1957 became effective for the calendar year beginning on January 1.

Appellant also urges that Proclamation No. 3160 was defective in that it did not proclaim a modification of an "existing" duty or other import restriction under subsection (a) (2) of section 350, supra. In this regard, we need only point out that duties on woolen fabrics were in existence long prior to the General Agreement on Tariffs and Trade; that among the concessions negotiated in GATT was the Wool Fabrics Reservation, which created an *optional* and *conditional* modification of those duties; and that in issuing Proclamation No. 3160 the President exercised the option and invoked the modification.

Finally, appellant challenges the basis upon which the President found, as a fact, that 5% of average annual domestic production of similar goods during the three years immediately preceding 1957 was no greater than 14,000,000 pounds. In this regard, appellant makes three basic contentions: 1) that the President should have established a fact-finding agency to compile statistics on United States production; 2) that the proclamation invoking the Wool Fabrics Reservation should have set forth specific facts relative to average annual domestic production; and 3) that the weight production statistics which were used by the President were based on estimates and were therefore insufficient.

As to the need for a fact-finding agency, we think that the choice and regulation of an instrumentality by which facts are gathered and analyzed are functions wholly administrative in nature. ▓ Where, as here, Congress has imposed no express procedural requirements in its delegation of authority and the President has complied, in every realistic sense, with the policy guidelines and the substantive limitations in both section 350 and the Wool Fabrics Reservation, we are convinced that the need for administrative flexibility dictates that the President be allowed broad latitude in deciding how the pertinent facts are to be determined.

The same can be said for appellant's contention that the operative facts must be contained in the Proclamation. Neither section 350 nor the Wool Fabrics Reservation contemplate such a requirement, ex-

pressly, or by implication. Indeed, what facts were available which could have been specified in Proclamation No. 3160? The figures relating to average annual domestic production during 1954, 1955 and 1956 are the pertinent figures and these were not fully available at the time of the Proclamation. Since we have found that Proclamation 3160 could lawfully operate *in futuro* to invoke the quota for 1957, this contention too must fail.

Appellant's last contention, regarding the adequacy of the evidence used by the President in setting the quota for 1957, likewise has no merit. Appellee's brief accurately summarizes appellant's position as follows:

Seemingly, appellant would demand, as a prerequisite to the validity of the over-quota rate, that the data on which the President bases his findings reflect every ounce of fabric produced in the United States, that that data be subject to *absolute* mathematical certainty (which, by the very nature of the subject matter, is manifestly impossible), and that what is meant by "similar fabrics" not be open to the President's judgment. Thus, if the President is unaware of a backwoodsman's production of twenty pounds of homespun in a particular year, a foreign trade agreement seemingly falls for lack of such knowledge. Appellee submits that no such review of the President's determination can be had judicially, that the trial court was amply justified in refusing to countenance a collateral attack upon such determination, and that only the fact of that determination is relevant in these proceedings.

It is familiar doctrine that the scope of review, by this court as well as other Federal courts, of factual determinations of an administrative agency is closely circumscribed. In *United States* v. *George S. Bush & Co.*, 310 U.S. 371 (1940), the Supreme Court reviewed a decision of this court which had invalidated certain Presidential findings of fact relating to the necessity for tariff modifications. In reversing, the Court said (at 379–80):

* * * the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment. It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review. * * *

For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains. Under the Constitution it is exclusively for Congress, or those to whom it delegates authority, to determine what tariffs shall be imposed. Here the President acted in full conformity with the statute. No question of law is raised when the exercise of his discretion is challenged.

Since the President's findings of fact with respect to average annual domestic productions of similar fabrics during the three calendar

years immediately preceding 1957 are supported by substantial evidence of record,[5] they are not subject to review by this court.[6]

The judgment below is accordingly *affirmed.*

MARTIN, J., sat but did not participate in decision.

---

[5] Exhibit 5 constitutes a document, apparently published by the Committee for Reciprocity Information, entitled "Production Statistics Used in Determination of 1957 Tariff Quota on Woolen and Worsted Fabrics Provided for in Paragraphs 1108 and 1109(a)," which sets forth the pertinent data.

[6] The dissenting judge below made much of the fact that certain evidence offered by appellant was not admitted. This evidence (plaintiff's exhibits 6, 7 and 8 for identification), which purported to show that the production statistics used by the President were based on inaccurate estimates, was excluded apparently because it was thought by the Customs Court to lack probative value. Appellant merely urges that the action of the court in this regard was error, and does not seriously argue the merits of admissibility here. In view of our decision as to the disability of this court to review administrative findings of fact supported by substantial evidence, the question of admissibility becomes moot.

See generally, with respect to judicial review of administrative findings of fact, Davis, supra, note 3, at 868–925.

